LEMMON, Judge.
In these four consolidated suits plaintiffs, who were standing passengers on a crowded city bus, sued both the public carrier and the driver of a pickup truck, whose near collision with the bus at an intersection controlled by a traffic light caused the bus driver to brake suddenly and jostle the standing passengers.
The case against the carrier proceeded on two theories: (1) the passengers were injured by the sudden stop, in which the bus driver either ran the red light or should have seen the truck doing so in time to avoid the accident without an emergency stop, or (2) the passengers were injured when Diana Shields, a package laden passenger, was thrown backwards just after she boarded the bus at the intersection because the bus driver did not allow her sufficient time to find a seat or to place her packages down and hold onto a railing.
After trial on the merits the trial judge found that the bus had the green light and the bus driver had acted reasonably in applying his brakes to avoid an imminent collision. However, he further found that the bus driver’s earlier negligence was the cause of the injuries, stating:
“Nevertheless, the bus driver was negligent in starting from the bus stop before a passenger, whose arms were full of packages, had a chance to find a seat or put her packages down so she could hold onto a railing. Her fall precipitated a domino effect in which the other claimants were injured. All should recover.”
The record provides support for the trial judge’s findings, and we affirm.
I
Inasmuch as all other plaintiffs claimed their falls were precipitated by Mrs. Shields’ fall, the initial inquiry is whether Mrs. Shields’ fall was caused by the starting or by the stopping of the bus, both of which occurred very close together.
The bus, traveling south on Dryades Street, a divided thoroughfare, stopped at *1124 the bus stop at the córner of the intersection with Melpomene Street, also a divided thoroughfare which had two travel lanes and one parking lane on each side of a narrow neutral ground. The bus driver testified: After he discharged passengers, he waited at the curb until the light turned green and then pulled directly into the intersection. About the time he reached the neutral ground area, he observed that a truck approaching from his right was not going to stop for the red light, and he slammed on his brakes and swerved to the left, successfully avoiding a collision. After the incident several people complained of injuries, but he had not seen any passengers fall on the bus.
Although he stated that when a passenger loaded with packages boards the bus so that “if they look to me like they might have a problem I’ll hold tight for a while”, he did not recall whether or not any passengers had boarded the bus at that intersection. Therefore, the bus driver’s testimony was of little value in determining the cause of the falls by Mrs. Shields and the other plaintiffs.
Mrs. Shields testified she boarded the bus with both hands so full (two big boxes of clothes, another bag of clothes and a purse) that the bus driver had to take the transfer out of her hand. She stated “just as I went to move that’s when the bus went to move and I practically ran, you know, scooted to the back to catch hold of something”, and “I fell. I must have started everybody to falling because I believe I was the first one to fall”. She fell into another passenger and struck her back on the first seat past the “love seat”.
Although she answered affirmatively an inquiry on cross-examination as to whether the sudden stop was the cause of her fall, her testimony that she fell toward the back of the bus was consistent with the balance of her testimony that she fell when the bus moved forward suddenly just after the driver took her transfer.
This conclusion is substantially supported by the testimony of the two other injured passengers.[1] Gail Baptiste, who was standing on the door side between the front and rear doors, noticed Mrs. Shields at the bus stop waiting for the bus and then saw her get on with both arms full of packages. She testified “she had just gotten on the bus, the bus took off and she swerved down the aisle which meant that everybody else who was standing had a chain reaction and fell on the floor”, adding “(i)t was so quick, looked like he didn’t really give her a chance to get on good”. Although Miss Baptiste admitted she would have fallen from the suddenness of the stop “irregardless of whether someone had fallen on me or not”, she was not sure that she first fell forward and then backward, concluding “all I know is that I fell”.
Amérales Brown, who was standing on the door side behind the “love seat”, testified Mrs. Shields boarded the bus loaded with packages in both hands and the bus “moved on right quick” while Mrs. Shields “was trying to get to a place where she could hold on at”. She further stated “everybody fell back and made me fall”.
Thus, while the plaintiffs themselves were uncertain as to whether the starting or the stopping of the bus caused the fall by Mrs. Shields and the “domino effect” fall of the others, their overall testimony, taken with the fact Mrs. Shields fell toward the back of the bus into the other plaintiffs who were further to the back of the bus, compels the conclusion that the starting was the principal cause of the falls.[2]
II
While a carrier owes the highest degree of care to its passengers, a bus driver is generally not negligent for starting the bus with a normal motion before the *1125 passenger is seated. Sharp v. New Orleans City R. R. Co., 111 La. 395, 35 So. 614 (1903). However, different circumstances provoke different duties, and there is a greater duty when a passenger’s appearance is such that a reasonable bus driver should know that there is danger in starting the bus before the passenger has an opportunity to seat himself or otherwise to become safely situated. Boarding by a passenger with a physical handicap, for example, calls for the exercise of greater precaution. 14 Am.Jur.2d Carriers § 982 (1964); 93 A.L.R.2d 237, § 4(b) (1964). The standard, as in all negligence cases, is one of reasonableness.
Consequently, when a passenger boarding a public carrier is so encumbered with luggage or packages that he will obviously have difficulty in maintaining or regaining balance, the driver should allow the passenger a reasonable time to achieve a situation of safety before starting the bus in motion. Saitta v. New Orleans Ry. & Light Co., 12 Orl.App. 278 (1915); Miller v. New Orleans Pub. Serv., Inc., 196 So. 86 (La.App.Orl.1940). Of course, negligence must be determined in each case according to the particular facts and circumstances.[3]
In the present case the bus driver should have been aware from Mrs. Shields’ appearance that it was not safe to start the crowded bus until she had an opportunity to put her packages down and hold on to a railing or otherwise balance herself. The trial judge’s conclusion that the driver did not allow Mrs. Shields such an opportunity is not manifestly erroneous.
There is no dispute as to the amount of the awards.
The judgment is affirmed.

AFFIRMED.

REDMANN, J., dissents and assigns reasons.

. The fourth plaintiff died prior to tidal from a cause unrelated to the bus accident.

. The trial judge’s unwillingness to render a judgment against the truck driver indicates an implicit finding that the emergency stop necessitated by the truck driver’s failure to obey the red light was not a cause of the accident.

. We distinguish on its facts the case of Carter v. New Orleans Pub. Serv., Inc., 305 So.2d 481 (La.1974), which involved a similar occurrence. However, the Supreme Court, in affirming the intermediate court’s reversal of the trial court, specifically found as a fact that the passenger’s fall was caused by the sudden stop while she was on her way to a seat, the court apparently concluding that the passenger, who was carrying a bag of groceries, an umbrella and a purse was not so heavily laden with packages as to require exercise of greater precaution and would have reached her seat safely except for the emergency stop.